**Robert and Beverly NIDA, Plaintiffs,**

v.

**FEDERAL EMERGENCY MANAGEMENT AGENCY, Defendant.**

**No. 91–49–CIV–2–BO.**

United States District Court,
E.D. North Carolina,
Elizabeth City Division.

Dec. 17, 1992.

598

W. Mark Spence, Nags Head, NC, for plaintiffs.

Linda Teal, Asst. U.S. Atty., Raleigh, NC, for defendant.

## ORDER

TERRENCE WILLIAM BOYLE, District Judge.

This matter is before the court on defendant's *motion for summary judgment*, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### Facts

In 1986, plaintiffs Beverly and Robert Nida sold their beachfront vacation home, located in Nags Head, North Carolina, to David and Jane Ewer, retaining a security interest in the property as holders of the Ewers' purchase money promissory note. Throughout the relevant period, the property was covered by a standard flood insurance policy (SFIP) issued under the National Flood Insurance Program (NFIP). The NFIP is a federally subsidized insurance program created by the National Flood Insurance Act, 42 U.S.C. § 4001 *et seq.* (the Act) and administered by the Director of defendant Federal Emergency Management Association (FEMA).

The Ewers' SFIP provided coverage for the repair of flood damage or replacement of the home, whichever was the lesser amount. This coverage was subject to limitations. Article VII stated that the NFIP's liability would not exceed the larger of (1) the "actual cash value" of the home, defined in Article II as replacement cost at the time of loss less depreciation, or (2) 80 percent of the undepreciated repair or replacement cost, or (3) the maximum amount of insurance available under the NFIP. In addition, Article III of the SFIP stated that coverage would extend only to "direct physical loss by or from flood," expressly excluding loss caused by theft.

In 1988, Congress passed the Upton–Jones Amendment to the Act, now codified at 42 U.S.C. § 4013, extending the coverage of existing SFIPs to include the cost of relocating or demolishing homes whose foundations were dangerously eroded by flooding. In order to recover under the Amendment, a claimant must prove clear title to a home which is covered by a SFIP, and which has been certified to be in imminent danger of collapse or subsidence due to erosion. The same coverage restrictions applicable to regular property damage claims filed under the SFIP also limit claims made under the Amendment. In addition, the Amendment contains a specific method of property valuation for use in paying claims made under its provisions, setting the value of a covered property at the lowest of either (1) the fair market value of a comparable structure not in danger of collapse, (2) the purchase price of the structure and any improvements thereon, as adjusted for inflation, or (3) the value of the structure declared in the SFIP. 42 U.S.C. § 4013(c)(3).

The Ewers' home was first damaged by flooding in April, 1988, when storm waters knocked down the deck and shifted several supporting piers. Nags Head officials initially condemned the structure, but certified it for re-occupancy on May 11, 1988, after the Ewers made the necessary repairs. During this period, the Ewers decided to move the house to a more sheltered spot. Accordingly, they filed a flood insurance claim under the Upton–Jones Amendment, obtaining the requisite certification of imminent collapse in late 1988 or early 1989.

On March 9, 1989, a northeaster struck the coast, causing even greater damage than the 1988 storm. Nags Head officials once more condemned the property. On March 30, 1989, the Ewers withdrew their Upton–Jones

claim, still pending from the 1988 storm, and filed a regular property damage claim under the SFIP. At the same time, they also filed a claim for property damage resulting from the 1989 northeaster. The NFIP subsequently issued two benefit checks, payable to the Ewers and plaintiffs as mortgagees. The first check, dated April 10, 1989, was in the amount of $1,203 for damages resulting from the April, 1988 storm; the second check, issued on April 17, 1989 in the amount of $13,655, covered damages caused by the more recent storm.

Faced with repeated flooding, and the cost of additional, uninsured repairs, the Ewers turned the property back to plaintiffs on April 29, 1989. The plaintiffs were then advised that the house had been broken into in mid-March, shortly after the second storm, but that no property had been taken or damaged. Despite this notice, plaintiffs made no effort to secure the house.

In June, 1989, plaintiffs informed the NFIP that they intended to make an Upton–Jones claim for the demolition costs of the structure. Unaware that the Ewers had withdrawn their previous Upton–Jones filing, plaintiffs thought they were perfecting the earlier claim. On August 23 and November 12, 1989, the NFIP notified plaintiffs that their claim could not be processed without proof of title. Plaintiffs did not provide the requested documentation until February, 1990.

During the intervening period between June, 1989, and February, 1990, while the plaintiffs' claim was pending before the FEMA, vandals stripped the house of all salvageable property. This included movable fixtures such as appliances, chandeliers and interior items, carpeting, plumbing, wiring and permanent fixtures such as wood paneling, windows, doors, and anything else that could have reclamation value. The thieves were so thorough that at one point Nags Head authorities posted a stop work order on the property in the mistaken belief that the building was under construction without a permit rather than under demolition by criminal trespassers.

Plaintiffs claim to have visited the property during this period on several occasions but do not claim to have witnessed the damage.

In the course of processing plaintiffs' claim, defendant arranged for a local insurance adjuster to appraise the property, employing the valuation method set out in the Amendment. Upon learning of the vandalism, defendant instructed the appraiser to reevaluate the property. After deducting $37,000 in estimated theft damages, the appraiser arrived at a current fair market value $42,023. Defendant used this revised figure in calculating the benefits due plaintiffs. Under the terms of defendant's Final Determination letter, issued September 5, 1990, the NFIP paid plaintiffs a total of $45,168 for the demolition of the home.

Plaintiffs now seek recovery of the $37,000 vandalism adjustment as having been improperly deducted. In support of this claim, plaintiffs contest both the timing of the appraisal and the method of valuation. Arguing first that they are entitled to the "actual cash value" of the property as defined in the SFIP, plaintiffs assert that they should have been credited with the replacement cost of the home based on a claimed date of loss of April, 1988, the date of the first storm. Although they concede that theft damage is not covered under the SFIP, plaintiffs protest that this additional damage occurred after both the initial date of loss and the filing of their Upton–Jones claim, during a period in which the house was officially uninhabitable. Plaintiffs further contend that the theft damage was irrelevant "from a practical standpoint," as the house was scheduled to be totally demolished.

In response, defendant notes that plaintiffs' claim was not filed for regular property damage under the SFIP, such that the SFIP's "actual cash value" valuation formula would apply; rather, plaintiffs sought relocation or demolition costs pursuant to the Upton–Jones Amendment, which contains its own valuation standard. As to the timing of the valuation, defendant points out that the Amendment expressly provides that no payment shall be made until after the Director of FEMA has made a final determination of the validity and extent of a claim, which in

this case did not occur until September 5, 1990. Therefore, defendant claims that plaintiffs are entitled to no more than the structure's fair market or replacement value as it stood at the time the final determination was rendered. On the strength of these arguments, defendants now move for summary judgment.

### Discussion

■ This controversy is well suited to resolution by summary judgment, as, despite the apparent confusion surrounding the origin and processing of plaintiffs' insurance claim, the parties agree on the material facts surrounding the sole legal issue raised in the case, which is whether defendant, in calculating plaintiff's benefits, used the proper valuation method at the proper time. Fed. R.Civ.P. 56(c). In resolving this question, the court's analysis is guided by federal common law. *See Leland v. Federal Insurance Administrator,* 934 F.2d 524, 529 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 417, 116 L.Ed.2d 437 (1991). Although it is an acknowledged axiom of federal common law that any ambiguity in an insurance policy should be interpreted in favor of the insured, *id.* at 529 n. 9, the court finds no such ambiguity here.

The Upton–Jones Amendment sets out three alternative valuation formulas to be used in paying claims brought under its provisions. In contrast, the actual cash value standard relied upon by plaintiffs is a general valuation method used under the SFIP for payment of property damage claims. This general standard cannot be presumed to apply to the unique costs associated with an Upton–Jones claim, particularly where the Amendment expressly provides its own valuation formula. Thus, by appraising the plaintiff's property based on the fair market value of a comparable home, not similarly in danger of imminent collapse, but similarly vandalized, defendant employed the first and, for it, least expensive of these methods, as it was clearly authorized to do.

■ The remaining issue is the timing of the valuation. Again, the court finds no ambiguity in the language of the Amendment. The valuation section of the Amendment, 42 U.S.C. § 4013(c)(3), is silent on the subject of timing. However, the text of § 4013(c)(1) repeatedly notes that payments due under the Amendment will only be made "following final determination by the Director." Thus, policyholders are forewarned not to expect payment until the Director has completed his investigation of the claim, of which appraisal is but a part. In light of this strong inference against immediate valuation of damaged properties, the court is disinclined to read such an obligation into the terms of the policy. *See Wagner v. Director, FEMA,* 847 F.2d 515, 518 (9th Cir.1988) (federal subsidy of NFIP constitutes a limited waiver of sovereign immunity whose extent should not be liberally construed).

The court does not agree with plaintiffs' argument that the vandals' partial demolition could have had no practical impact on the value of a structure doomed to total demolition. It is true that any fixtures spared by the vandals would have fallen prey to the wrecking ball. However, this argument ignores the fact that the valuation system set out in the Amendment does not distinguish between those homes which are scheduled for demolition and those which will be relocated. Plaintiffs cannot credibly argue that they would have contested defendant's theft damage deduction if they intended to relocate the house, as to do so would effectively require the federal government to subsidize 40 percent of plaintiffs' clearly uncovered losses. Conversely, it would be unjust to allow plaintiffs to receive credit for such uncovered losses on the fortuitous grounds that they planned to demolish the structure.

■ The NFIP is neither a disaster-relief program nor a welfare system, but a federal initiative designed to make affordable flood insurance available for relatively high-risk properties. While the program provides insurance coverage at below-market rates, its terms should be construed no more liberally than comparable private insurance policies. *See Leland,* 934 F.2d at 530. Defendant was within its rights under the terms of the SFIP and the Upton–Jones Amendment in appraising plaintiffs' property based on the fair market value of the vandalized structure. Accordingly, defendant's motion for summary

judgment is ALLOWED, and the matter dismissed.

SO ORDERED.