**UNITED CAPITOL INSURANCE COMPANY, Respondent,**

v.

**HOODCO, INC., Appellant.**

No. 73025.

Missouri Court of Appeals,
Eastern District,
Division One.

June 16, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 6, 1998.

Application to Transfer Denied
Sept. 22, 1998.

Richard J. Zalasky, Rabbitt, Pitzer & Snodgrass, St. Louis, for appellant.

Robert W. Cockerham, T. Michael Ward, Russell F. Watters, Brown & James, P.C., St. Louis, for respondent.

GARY M. GAERTNER, Judge.

Appellant, Hoodco, Inc., appeals the judgment entered by the Circuit Court of St. Louis County in favor of respondent, United Capitol Insurance Company, on United Capitol's motion for summary judgment and on Hoodco's counter-motion for summary judgment. We affirm.

This appeal involves questions regarding United Capitol's liability for property damage sustained by Hoodco as a result of the great flood of 1993. Hoodco is a discount building supply company with several locations in Missouri, including a store in West Alton, which is the subject of this appeal. In March 1993, Hoodco's current insurance carrier informed Hoodco it would no longer provide coverage to the company due to a change in the insurer's practices. Hoodco contacted its broker, Bill Wittenberg, at C.J. Thomas Company and informed him they needed to find a new insurer. Wittenberg had secured insurance for Hoodco since 1986.

On April 14, 1993, Wittenberg filled out an "ACORD" form, which is a standard commercial insurance application used in the industry. One portion of the form asked whether the applicant, Hoodco, had "[a]ny catastrophe exposure?" This question generally pertains to exposure to flooding, earthquake, and the like. Although Hoodco's West Alton store lies in a class A–2 floodplain,[1] Wittenberg checked the "no" box in answer to this question, because he was not asking for flood coverage. When Wittenberg was unable to secure insurance for Hoodco in the regular insurance market, he contacted Kevin Westrope of Westrope & Associates. Westrope was a surplus and excess lines broker who could submit applications to various surplus and excess lines carriers. He had a contract with United Capitol, which was one such carrier. The brokerage agreement between the parties allowed Westrope to submit applications to United Capitol for its review, but gave Westrope no binding authority for the insurer.

Wittenberg forwarded a copy of the ACORD application to Westrope along with a copy of Hoodco's current policy, which did

not provide flood coverage. Westrope drafted a cover letter to various excess and surplus lines carriers to accompany the ACORD application. The letter, dated June 3, stated, "[Hoodco has] no flood exposure and earthquake is minimal." Westrope claimed he made this assertion after discussing the fact with Wittenberg. Wittenberg denied ever telling Westrope that Hoodco had no exposure to flood. The cover letter also proposed various terms of coverage including flood coverage. The letter and applications were faxed to various insurers on June 4, 1993.

United Capitol responded to Westrope's letter and the application by relaying a quote back to Westrope. The quote included terms for flood coverage. Westrope forwarded the quote to Wittenberg on June 9. Wittenberg saw the quote included flood coverage which he thought advantageous to Hoodco. He did not inform Westrope or United Capitol of Hoodco's increased risk for flooding, although he knew of Hoodco's West Alton store location in a floodplain. Hoodco settled on the quote offered by United Capitol, and on June 21, Wittenberg made his first request for a binder.

Four days later, on June 25, 800 families were evacuated from West Alton due to rising flood waters. An article in the June 26, 1993 "St. Louis Post–Dispatch" stated a second crest of the Mississippi could take place on July 7 or 8, due to flood waters moving down from Wisconsin.

On June 29, 1993, Wittenberg again contacted Westrope requesting a binder which reflected Hoodco had flood coverage because, at this time, Hoodco had a "good indication" it's West Alton store would be flooded. Around this date, Hoodco began advertising a "Flood Sale" in an attempt to liquidate its inventory. On July 6, 1993, United Capitol issued a binder, through Westrope, reflecting the various coverage terms including coverage for loss due to flood. The binder stated the policy went into effect at 12:01 a.m. on July 8, 1993, the date on which Hoodco's then current policy expired. Also on July 6, Hoodco was moving inventory from the West Alton store to its other locations in an at-

1. This is the highest class of floodplain.

tempt to minimize its loss. Hoodco received the binder on July 7. That same day, the levee protecting the town of West Alton was breached, and thousands of West Alton residents were evacuated.

Prior to receiving the binder on July 7, Wittenberg contacted Jesse Martin, an employee of Westrope & Associates. He requested the flood coverage in the policy from United Capitol be made "in excess of" the flood coverage Hoodco had through the National Flood Insurance Plan ("NFIP").[2] Martin did not speak with anyone at United Capitol before converting Hoodco's coverage, despite her knowledge that insureds who qualify for NFIP coverage are situated in flood plains. Wittenberg received the endorsement effecting this change to the binder on July 8. Sometime late on July 9, Hoodco's West Alton store flooded.

On July 12, 1993, United Capitol received a copy of the binder and endorsement issued by Westrope. On July 20, 1993, United Capitol received Hoodco's proof of loss claim for the property it lost as a result of the flood. On July 21, 1993, United Capitol issued the insurance policy to Hoodco. Almost one year later, after investigating Hoodco's claim, United Capitol sent Hoodco a letter on June 24, 1994, denying its claim, citing Hoodco's material misrepresentation regarding its catastrophe exposure, as well as the fact the flood was in progress at the time the insurance policy went into effect. United Capitol also returned Hoodco's premium payment.

United Capitol then filed its petition for declaratory judgment, alleging the insurance contract was void due to Hoodco's material misrepresentation on the application and alleging Hoodco's loss was in progress before the policy went into effect, and therefore was not covered. Hoodco filed a counterclaim for damages alleging United Capitol breached the insurance contract by a vexatious refusal to pay. Both parties filed motions for summary judgment accompanied by memoranda and various documents and deposition testimony. The trial court entered judgment in favor of United Capitol on both motions, and Hoodco appeals.

Summary judgment is appropriate where the moving party shows, through the use of pleadings, depositions, admissions, or affidavits, there exists no genuine issue as to any material fact, thereby entitling the moving party to judgment as a matter of law. Rule 74.04(c)(3). Because the trial court's judgment is founded wholly on the record submitted and on the law, we need not defer to the trial court's order granting summary judgment, but may conduct an independent review. *Jos. A. Bank Clothiers, Inc. v. Brodsky,* 950 S.W.2d 297, 300 (Mo.App. E.D.1997). We review the evidence in the light most favorable to the non-moving party, though facts set forth by affidavit or otherwise in support of the motion will be taken as true unless contradicted by the non-moving party's response. *Id.* We will uphold the judgment of the trial court if it is sustainable under any theory. *Id.* Having set forth our standard of review, we turn to the issues raised by Hoodco.

Hoodco's first and second points on appeal relate to whether Hoodco made a material misrepresentation on its application so as to render the policy void *ab initio,* and whether genuine issues of material fact exist so as to preclude the trial court from entering summary judgment on this ground. Hoodco's last point on appeal challenges the trial court's use of the "loss in progress" doctrine as a basis for granting United Capitol's motion for summary judgment. Because Hoodco's last point is dispositive, we will address it first.

Hoodco argues the trial court erred in granting summary judgment in favor of United Capitol based on the "loss in progress" doctrine as the damage sustained by Hoodco did not occur until after Hoodco had applied for the policy and after the policy went into effect. We disagree.

■ The "loss in progress" doctrine is " 'a fundamental principle of insurance law [which provides] that an insurer cannot insure against a loss that is *known or apparent to the insured.' "* *Inland Waters Pollution Control v. National Union,* 997 F.2d 172, 177

---

**2.** Wittenberg testified in his deposition he advised Martin of the possibility Hoodco was going to flood. Martin testified in her deposition she was not so informed.

(6th Cir.1993) (citation omitted); *see Bartholomew v. Appalachian Ins. Co.,* 655 F.2d 27, 28 (1st Cir.1981) (holding insureds could not recover from insurer where insureds were fully aware of loss before policy in effect). The doctrine builds upon the principle one cannot insure property that has already been destroyed. *See M.F.A. Mut. Ins. Co. v. Quinn,* 259 S.W.2d 854, 860 (Mo.App.K.C. 1953). The doctrine is rooted in preventing fraud on the part of an insured, who would obtain an insurance policy knowing he has suffered or is in imminent danger of suffering a loss, and who would fail to disclose these facts to the insurer. *See Presley v. National Flood Insurers Association,* 399 F.Supp. 1242, 1244 (E.D.Mo.1975); *United Technologies Corp. v. American Home Assur. Co.,* 989 F.Supp. 128, 151 (D.Conn. 1997).[3] Moreover, several courts, including a federal court applying Missouri law, have approvingly stated, " '[W]here some quick process of destruction is under way at the moment, even insurance innocently bought and issued should not cover.' " *Presley,* 399 F.Supp. at 1244–45 (citations omitted). As stated by the Sixth Circuit after a comprehensive review of case law addressing the issue, the "loss in progress" doctrine "operates only where the insured is aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for." *Inland Waters,* 997 F.2d at 178.

In *Presley,* the district court found flood damage suffered by the insured was not covered where the insured applied for and received the insurance policy after flood waters had already entered his home and receded several times, though the greatest damage occurred within the policy period. *Id.* at 1245. Similarly, in *Summers v. Harris,* the court applied the doctrine so as to preclude coverage for flood damage where the flood was in progress when the insurance was purchased though the water did not actually cause damage until after the policy period began. 573 F.2d 869, 872 (5th Cir.1978). In reversing the trial court, the court of appeals

found it was error to find coverage merely because the insured "won the race with the waters … " where the flood causing the damage had been in progress for over a week. *Id.* at 871. *See also Drewett v. Aetna Cas. & Sur. Co.,* 539 F.2d 496, 498 (5th Cir.1976) (holding insurer was not liable on policy which was issued after flood waters had reached insured's property but had not entered the home).

■ Here, there were indications of flooding as early as March 1993, though Hoodco was not in imminent danger at that time. Hoodco, through Wittenberg and with the help of Westrope, went about securing a policy of insurance from April through early July. On June 21, merely four days before hundreds of West Alton citizens were evacuated, Hoodco decided to obtain its new policy through United Capitol, and requested a binder. When the binder had not been sent by June 29, Wittenberg, who acknowledged the parties had "a good indication" Hoodco's West Alton store would be flooded at that time, repeatedly contacted Westrope about issuing a binder reflecting Hoodco was protected in the event of flood. Throughout these conversations, Wittenberg remained silent about the peril immediately facing the Hoodco property. During this time, Hoodco was holding a "Flood Sale" in an attempt to liquidate its merchandise.

On July 6, United Capital issued a binder to Wittenberg and Hoodco, who were at this time certain the store would flood. Hoodco was in the process of moving material from its West Alton location to other stores. On July 7, Wittenberg videotaped the road leading into West Alton in order to show the flood waters had not yet reached the town, misstating on the tape the date was July 8, the day the levee was expected to break and, incidentally, the day the policy from United Capitol was effective. Also on July 7, the levee broke causing thousands to be evacuated. The Hoodco property flooded on July 9 and 10.

---

3. The "loss in progress" doctrine is often discussed in conjunction with the "known loss" doctrine, and often these doctrines are used interchangeably. *Outboard Marine v. Liberty Mut. Ins.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1209–10 (1992).

This demonstrates the loss was in progress before the policy went into effect: the levee protecting the town and Hoodco's store broke one day before the effective date of the policy. Therefore, what before had been a contingent event, the flooding of Hoodco's property, became a real and known event at that time. Accordingly, it does not matter who "won the race with the waters," because once the levee broke the loss was in progress so as to preclude coverage, although the damage did not manifest itself until two days later. *Summers*, 573 F.2d at 871–72. Moreover, in light of the knowledge component of the "loss in progress" doctrine, the flood was in progress even before the levee broke when Hoodco admitted it knew the property would flood at least three or four days before it happened, and Hoodco actively engaged in efforts to diminish its losses by holding a sale and removing merchandise from its West Alton warehouse. "By its very nature, insurance is fundamentally based on *contingent risks* which may or may not occur.... Where the insured has evidence of a probable loss when it purchases a ... policy, the loss is uninsurable under that policy (unless the parties otherwise contract) because the 'risk of liability is no longer unknown.'" *Outboard Marine v. Liberty Mut. Ins.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1210 (1992) (citation omitted).

■ Hoodco's argument against the application of the "loss in progress" doctrine centers on Hoodco's knowledge of the probability of flood at the time it applied for the insurance. While some of the cases previously cited involved facts where the insured applied for the insurance when the loss was occurring, this distinguishing fact is not dispositive. In those cases, the application was filled out and the insurance was issued within a very short period of time, as opposed to the instant case, where several months passed between the application and the issuance of the binder reflecting coverage. Here, Hoodco actively sought to secure coverage when it knew its property was in imminent danger of flooding by making repeated requests for a binder and failing to disclose its immediate risk. Under the present facts, the contingent risk of flooding for which United Capitol agreed to insure Hoodco beginning on July 8, 1993, was no longer contingent when the policy went into effect. *See Bartholomew*, 655 F.2d at 28. The application of the loss in progress doctrine under these circumstances is consistent with the theory of insurance, which is to insure unknown and contingent risks. Accordingly, we find the application of the doctrine appropriate in this case.

Because we can sustain the judgment of the trial court on this ground, we decline to address Hoodco's other points on appeal. Based on the foregoing, the judgment is affirmed.

GRIMM, P.J., and PUDLOWSKI, J., concur.